Good morning, Your Honors. Dennis Reardon and Matt Dirks for appellant C.K. Shah. Your Honors, this is a case coming out of a bankruptcy court, but it's really a contract case based on California law. And I'm going to turn to the terms of the contract and contract law in a moment, but I just wanted to point out two things that make this case and this judgment really, really odd. One of them is this. The hotel, and I realize it's the trustee who's the appellant here, but for most purposes of this, I'll use the word hotel because that's the entity that's really involved in all of this. But the hotel and its owner, through financial misfeasance, they buy a hotel for, I believe, $15 million in 1997. Ten or 12 years later, they're underwater and owe at least $27 million to GECC, the lender. And they're in default. They'll receive nothing from the foreclosure sale. They go into bankruptcy. The hotel, they fail to get approval of the sale that's at issue here. The hotel goes into a foreclosure sale. It can't even reap $15 or $16 million. So the GECC winds up $10 million at least to the worst, and yet the hotel comes out $12 million to the good. They come out $27 million better than the lender that they defaulted on. And the second thing is that the hotel claims the trustee a contract breach, but there really never was a binding contract in this case. And the reason for that is that the hotel had no legal capacity to fulfill its part of the bargain, which was the ability to sell the hotel, unless it got approval from the bankruptcy court, which it had the burden of doing and failed to do. And this is the very strange thing, is that that approval would have been necessary really to make a binding contract. And the court below found that the hotel, the trustee, had not proven, had not proven that the bankruptcy court would ever have approved this sale, which the bankruptcy court called the Hail Mary Pass. And as a result of that, and in fact the evidence I submit is overwhelming, that the bankruptcy court would have never approved it, because the buyer and seller couldn't possibly provide the protection for the lender that the bankruptcy court was demanding. It would have been a lot better argument for you if your guy had given them all they wanted in order to try to make it happen, and then they didn't get it to happen. We're really talking about what did your client do or not do in relation to his obligations to make this happen or not make it happen. He did not guarantee it was going to happen. Nobody suggests he did. But he does agree and guarantee that his corporation and he will actively and fully assist the debtor in obtaining the approval as required by the testimony that will support adequate assurance of future performance. That's what he agreed to do. And he did not do that. Well, Your Honor, in that regard, what he did do... I mean, that's what the bankruptcy court says he did not do. Right. And I owe them some deference in that determination. Well, Your Honor, I submit, since the facts are undisputed here as to what happened, that it's a de novo review on the Court's part. Well, I know you submitted that, but all I'm suggesting to me is if I'm going to look at these facts and I'm going to look at what they say, and I don't know that they weren't disputed, even if they were disputed, then certainly your argument is bad. But even if they weren't disputed, I'm having a tough time understanding how the Court was wrong. Well, what is undisputed is that, and was before the bankruptcy court, is that the buyer, C.K. Shaw, agreed to assist in obtaining new appraisals. The only thing he did not agree to do, only thing he did not agree to do, was pay for them himself, which is what the... But again, what language says that he should not have provided those appraisals at his own cost when the debtor required it? Well, two things. There is nothing in the contract... There is only one provision in the contract that deals with cost, and that provision is  That is in the contract. There is nothing in the contract that says that he has to pay for appraisals. And Mr. Myers, the attorney for the hotel, stated explicitly he drafted the contract and he did not put in there any obligation to pay for appraisals. What is in the contract is, at best, is, at most in terms of cost, is that they will And, therefore, the insistence in the Third Amendment that he pay for those appraisals himself is, in fact, at odds with the contract that he did sign, as opposed to the Third Amendment, which he did not. He offered to assist. He also said... Did he ever offer to pay for half the cost of reappraisals? I didn't... It's my understanding he never offered to do anything to be cooperative in getting appraisals. It wasn't really the cost that was the issue. Oh, I beg to differ. He said to them, I have appraisals. I can update them. I can get an updated appraisal, and relatively quickly. And the Third Amendment insisted that he pay and he pay exclusively. Did you make that argument in the court below? Oh, yes, absolutely. I don't find it. About the splitting the cost of the appraisals? I wonder where you made that below. I looked for it and couldn't find it, because I knew you were going to make it here, so I thought I better look down there and see what was made. Let me... What we're talking about here is signing the Third Amendment, and what... On December 18th, in front of the Judge Afremsky, Mr. Meyer said that, look, we're going to get a Third Amendment. We need it. We need the buyer's approval of it. And the court agreed, yes, you need a Third Amendment. And we're talking about pages... I'll get you the citation in the ER. We're talking about pages 134 through 137 or 138. And the court... And Mr. Meyer says, we'll get a Third Amendment, and it will deal with some of the changes we're talking about, and it specifically had to do with deeds, changing deeds, getting multiple deeds, and so forth. What Mr. Meyer did not tell the court, of course, is that he was going to insist that Mr. Shaw pay for the appraisals. And I want to point out one other thing about this Third Amendment. And Your Honor, I will candidly admit that what I'm about to say is not in our briefs. It's a factual point. It's not argued below? It was not. Well, then why argue it here? Well... Because it's waived. Well, let me point it out, and Your Honor, it's a pure question of law. If you look at... It isn't a pure question of law, it's a fact. Okay. But it's a fact before the court and presented in our ER to the court. It deals with... The Third Amendment is obviously before the court, the proposed amendment. And in addition to imposing an obligation to come up with perhaps $100,000 to pay for these appraisals, the additional thing that that Third Amendment contains is this. The PSA that Mr. Shaw signed says that he'll put up $250,000, which he did, it's still in escrow. And if the deal isn't approved, the buyer will... The seller will get $25,000 to cover its costs. He'll get back $225,000. The Third Amendment says... And then, if the court approves it, he puts up another $250,000, the buyer does. The Third Amendment says, no, you have to put up the other $250,000, so we'll now have $500,000 in escrow before the court approves it, issues its decision. And if the court doesn't approve it, we, the seller, get $400,000. Not $25,000, $400,000. It's a poison pill in the Third Amendment. It's certainly nothing — it didn't have anything to do with the amendment that was discussed with the court. And what it really is, I submit, is a recognition that the — that the seller is well aware that this deal isn't going to get approved, and instead of getting $25,000, it wants $400,000. But we're not really concerned about the Third Amendment, are we? Because the Third Amendment was never agreed to. So what we're only really concerned about was the purchase agreement. Well, I think we — well, let me get to the basic premise. I mean, how could — how could the seller be in any way damaged if — if it is — if the bankruptcy court would not approve the sale? I mean, if they don't approve the sale, then — then the contract doesn't go into effect. The hotel has suffered no damage. How can someone get an award of $12 million, which was certainly contingent on bankruptcy approval of the sale, when the record does not support — does not find that the bankruptcy court would have approved this deal? But we don't know it wouldn't have. No. We — but isn't it a question of burden of proof? Don't they have the burden of proving that the — that the failure of — But they — what they proved was that your client made it impossible for the bankruptcy court to approve it. And — and so we don't have to get to the ultimate issue. That other issue that you're talking about is they would have approved it because your client made it impossible. Well, Your Honor, we use one example. I'll use another here. Someone contracts with a — with a Uber, with a limousine service, to take them to a foreclosure sale, OK? They intend to bid — to win the bid and — and pick up a piece of property that could ultimately provide them with very substantial profits. The — the limousine service doesn't show up. They don't make it to the foreclosure sale. Can we award them all of those damages without some showing — some showing that they would have obtained the — Counselor, you had a chance to make all these arguments before the bankruptcy court. You had a chance to suggest that the contract should not be applied or should not be valid as a result of all of these. And hearing your evidence and the other evidence, that's what the bankruptcy court found. That wasn't enough. This contract was not performed. It was an invalid contract. All you're doing is arguing facts. Well, we would agree on this. There can be a breach of a contract, and that doesn't result in any damages without a showing. Well, are you now moving then to damages? Are you now moving to your damages argument? It's the most fundamental argument. Okay. It's my understanding that you do not seek enforcement of the liquidated damages provision as a formal legal limit of the liability on the damages. That's correct, Your Honor. We did. Then you're contending that liquidated damage provision is conclusive proof, if I read what you said, of the party's reasonable estimate of the damages. That's correct, Your Honor. Okay. Well, bankruptcy court said it doesn't control, because you waived the provisions of CalCivPro2809. Your Honor, let me be absolutely clear that if I was here saying there's a binding liquidated damages clause, it would be a weak argument. Nonetheless, I mean, California demands reasonable foreseeability in terms of damages and relies on the expectation of the parties. There is no question that the owner of the hotel, who was the seller and the buyer, agreed that the reasonable expectation, if you look at the agreement they signed there, is that that $500,000 would be absolutely the worst case scenario in terms of damages. So I agree with you that if the court finds a breach, you know, the notion that they're entitled to $12 million in this situation, I submit, is preposterous. And that $500,000, if there's going to be an award, is the appropriate award based on that. Do you argue that the damage award exceeding $500,000 was not foreseeable? I am saying that the parties agreed that anything in excess of $500,000 was not reasonably foreseeable. They agreed to that. And they both signed that. And putting aside the- Well, I guess I didn't ever see that. I didn't know that you ever argued that the damage award exceeding $500,000 was not foreseeable in the lower court. Well, Your Honor, I believe that we did. But- I was having a tough time. It seems to me that the only thing I've got now in front of me as to whether the damage figure, given the breach, if, in fact, the bankruptcy court was right on the breach, because it didn't seem to me you made any other argument in the lower court. Well, Your Honors, let me say that we certainly argued vehemently in the bankruptcy court and in the district court that the hotel had failed to prove $12 million worth of damages. I understand that. And, therefore, if there is a finding of breach, I submit that on this record, the only award that would be appropriate is $500,000 because the parties agreed that that was the maximal reasonably foreseeable amount. And they both personally signed it in their personal capacity. Thank you, Your Honor. Thank you, Mr. Bearden. We've consumed all of your time. I will allow you one minute for rebuttal. Thank you. Mr. Hennifer? Good morning, Judge Bolloy, Judge Vibey, and Judge Smith. May it please the Court. I'm James Hennifer, and I represent the trustee in the bankruptcy of the San Jose Airport Hotel. I'd first like to address three things that came up in the appellant's argument, which I think are important and which justify some clarification. The first was the issue of this third amendment, which they have tried to rely on. The third amendment has to be put into context. As Judge Bolloy pointed out, it was not signed, and it wasn't signed because there had already been an anticipatory breach declared. And the third amendment did not come up until the 17th of December 2009. It came up as a result of the San Jose Airport Hotel saying, their counsel, Merle Myers, saying, look, you've anticipatorily breached because you've agreed to provide, and we have nothing to present to Judge Efremsky to make our case. And without that, we can't move ahead. So please agree to come up with these things. You're in an anticipatory breach, or we'll default the contract. We have to. We cannot proceed without the backup to your financial statements. Had Mr. Shaw previously provided a detailed financial statement with supporting documentation? Well, what had happened, and that's a very, very good question. He had provided a SBA statement of what his assets were. They had put that in as a declaration before Judge Efremsky and the bankruptcy court to support the motion to sell. And then Mr. Shaw had told them, that's not accurate. It's all wrong. I don't have any support for that. It's withdrawn. And in fact, they said, well, it's a little late to withdraw it, but please supply something else. Give us something now and give us some backup to it. And Mr. Shaw said, no, it's futile. I don't want this deal. He really, what happened here, it's, if you will, buyer's remorse. It was a heck of a deal, but it started looking bad in November of 2009 when GECC came in and made their case that the recession, the Great Recession, had reduced hotel prices and that this wasn't worth even the great deal that Mr. Shaw had gotten on it. So they were stuck with nothing at the point in time when they declared an anticipatory breach. And the second issue that came up was the issue of the liquidated damages provision. And the liquidated damages provision, of course, is a provision between CVAC, the entity Shaw was going to create but never did, which was a breach of his warranty that this entity, CVAC and Sons, would perform the contract. It was between them and the hotel, and between the two of them in the purchase and sale agreement, they agreed that they would limit the damages between the two of them as between CVAC and the hotel to the amount of the liquidated damages, 300,000. But I think as Judge Smith properly pointed out, in the guarantee, the absolute irrevocable guarantee that Mr. Shaw signed, he waived Civil Code Section 2809, which says that the amount of the guarantee by Shaw could not exceed the amount of the damages by CVAC. And having done that, having knowingly waived that, it's moot. He has to pay up to $20 million. Unless you want to just throw out the guarantee, which is what the district court found Mr. Shaw liable on, it's a contract. He's made a contract, he's guaranteed it up to $20 million, and he's waived the provision that they're now depending on. They're trying to backdoor this by saying, well, OK, it says the parties to this only foresaw $500,000 in damages, and that foreseeability is now going to limit the liability in this case. It doesn't work that way. The foreseeability here, as Judge Johnson and Judge Davila went over in great detail, was the foreseeability that if he didn't supply any backup or anything at all as to his finances and his wherewithal to do this deal, then they were dead in the water in the bankruptcy court. There was no way that even an experienced bankruptcy counsel like Merle Myers, who, as Judge Johnson said, was a very accomplished bankruptcy lawyer, not just accomplished as a bankruptcy lawyer, but good at 363, which is a sale without lien, which is sort of a short form, if you will, of a Chapter 11 reorganization, where you can get a creditor who's recalcitrant, and there's no doubt here that General Electric Credit Corporation didn't want to be in this deal. They were getting out of the business of loaning money on real property, and they told the hotel that, we've renewed you twice, this is a recession, real properties was bad news in 2009, and who guessed that we'd be still arguing that in 2019, but it was a fair crisis, and it was a big crisis in the Silicon Valley. I mean, all over the United States in terms of real property in farms, in housing. The third issue that I wanted to get to that was brought up by appellants was the issue of costs will be shared. Yeah, there is a provision in the contract, he's correct, that there is a cost sharing, but that's closing costs. This is a real estate deal, and that is a very standard clause in any real estate deal, that the parties will share according to the custom of where the real property is, the closing costs will be shared. This isn't a sharing of the cost for getting the deal done, it isn't a sharing of costs under the 6.2.4 of the purchase and sale agreement. Those were the three issues that I wanted to address before I address my comments to the court. Okay, this case does raise an important question, I believe, that is can a party enter into a written and specific contract that has broad inclusive obligations for that party, and in exchange for those broad and inclusive obligations, they have a huge potential financial upside and they get into the deal with very little cash. That's what Mr. Shaw did, and he's a very experienced businessman. We're talking about a man here with engineering bachelor and a master's degree, we're talking about a man with a MBA in finance from Case Western and advanced courses at Harvard Business School. This is a very sophisticated man and he, in fact, knew what he was getting into and it was a pretty good deal. This property, it was only 16 acres, I say that because 16 acres is not much in Iowa or Utah or in San Jose, with high-rise development on it. At one point, before the Great Recession, it was worth a hundred million dollars. The owner had been offered a hundred million dollars for that property for development, had a 500-room hotel on it, and Mr. Shaw was going to get into this deal that at one time was worth a hundred million dollars for $46.2 million and he was only going to have to pay $1,000. Well, that's a terrific deal, but in exchange for that, he agreed on his part to supply the financial information that was necessary to go into the bankruptcy court in front of Judge Efremsky and do this very, at least to me, it was a complicated deal, to sell without the liens. In other words, to force GE to take paper rather than a payoff of its loan. So, that was the real situation we were in here. And four times in this, in the proceedings in this case, in good judges with careful, thorough, written opinions based upon the same complete record we're looking at, said that a party that gets into that can't simply say, I didn't perform, but let's speculate about what might have happened if I hadn't breached and escape liability totally. As the Brookman case, the California case that talks about substantial or the substantial cause, says it would be contrary to good social policy and it would greatly devalue the sanctity of contracts if you encourage breaches by defendants and let them litigate potential causes of damage. So, they say if you identify a substantial factor in the damages, that's enough. You supply, you have satisfied your burden of proof and that's what we did here. Now, Mr. Shaw, with very clever counsel, has put forth in these four proceedings, the trial, the first appeal before Judge Davila, the remand before Judge Johnson, and the second appeal to Judge Davila, 17 different legal theories. And we're seeing new ones as we speak here. And none of those have been successful for the simple reason that there was a broad obligation and Mr. Shaw simply did not meet it. Now, taking a look at, and I think the court has already looked at this, at 6.2.4 of the PSA, Mr. Shaw agreed for this deal he was getting that he would actively and fully assist the seller, that actively and fully, those exact words, in obtaining bankruptcy court approval. And he was well aware of what bankruptcy court approval was. It was to convince Judge Vremsky that this could be sold without the liens of GECC, that GECC, General Electric Credit Capital Corporation, would have to leave its lien on this property and accept paper and other security. Now, the other security was collateral properties of Mr. Shaw, and the other securities was a 20 million dollar guarantee by Mr. Shaw, and a 46.2 million dollar purchase price, which was in the form of a note. And that obviously looks good if you can back it up. And that was exactly what Mr. Shaw was supposed to do. And it's what he... Counselor, is it true that Mr. Shaw initially offered 70 million? Yes. And then after the recession, he backed up and put in 46.2 million and the $750,000 cash? That's absolutely true. That is able to perform or might not have been able to foresee the conditions coming in the future is foreclosed as well. Yes. Because he already knows he had to put up 70, but after the recession came, he could get it for less, and that's what he got it for. Right. And even more than that, when Judge Vremsky said, I think this deal is a little cash light, lacking in cash, Mr. Shaw got the owners to put up 2 million in cash right up front to say, look, okay, GE, you're going to get paid $2 million. And that was the second amendment to the contract, which was signed. And Mr. Shaw, at that point in time, in November, said, oh, yeah, fine, you know, I'm good for my part of this. You put up 2 million in cash to help make this deal float with Judge Vremsky, and we're good to go. It wasn't until after that that Mr. Shaw simply said, I'm not going to do anything. I think I wanted to finally close on the issue of the breach of the purchase and sale agreement. I haven't gone through all of the 6.2.4, which, as requested by seller, was another part of that. In other words, when you say, as requested by seller, and the seller requests that you back up your financial statement, that seems to me without limitation, including complete financial, experiential, and strategic information and testimony, and the adequacy of protection of the interests of GECC, which says you've got to do it so that GECC will be asked by the court to accept this deal and go ahead. The final thing is simply, the finding by Judge Johnson, as affirmed by Davila, was that Myers testified credibly that after signing the PSA and failing to obtain GECC's approval of the proposed sale, he attempted repeatedly to get further information from Shaw to support a conclusion that he was financially capable of closing the sale on the hotel and performing under the GECC loan. In the end, Shaw refused to provide further financial information. And the testimony on that at trial that Judge Johnson heard and to which he is owed a deference is, from the time the document was signed... Mr. Hennifer, Mr. Reardon, I've allowed you another minute. I think I can do this in one minute. The bankruptcy judge said there was no breach by Mr. Shaw for failing to have $20 million in collateral. Judge Afremsky made absolutely clear that unless he saw $20 million in collateral, he was not going to approve this deal. The bankruptcy judge did make a critical finding of fact that Shaw's contention that by December of 2009, there was no point in giving the debtor further appraisals because his claim that his assets had depreciated enormously, quote, is consistent with the dramatic decline in the hotel's value at that same time. They are asking for $12 million when the record is clear they would have never, Judge Afremsky would never have approved this deal. If $500,000 is what he has to pay for breaching an obligation to produce information, it's one thing. But there's no way that they can claim fairly that they would have received the benefit of the bargain because Judge Afremsky would have never approved the proposed sale. And we rest that on a claim that we've made throughout this proceeding, which is Judge Johnson's finding of the depreciation in assets. Thank you very much, Your Honor. Thank you, Mr. Reardon. We thank both counsel for the argument. In re San Jose Airport Hotel is submitted. With that, we've completed the oral argument calendar for the week. The court stands adjourned.
judges: Melloy, Bybee, N.R. Smith